**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ANTONIO P. SALAZAR, | * | |
| Plaintiff, | * | Case No. 1:21-cv-00866-ELH |
| v. | * | |
| FORTIVA FINANCIAL, LLC, *et al.* | * | |
| Defendants. | * | ORAL ARGUMENT REQUESTED |
| | * | |
| | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION TO REMAND**

CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street N.W.
Washington, DC 20001
(202) 862-2200

MCGUIREWOODS LLP
500 E. Pratt Street, Suite 1000
Baltimore, Maryland 21202-3169
(410) 659-4400

*Attorneys for Defendants Bank of Missouri as
successor by merger to Mid-America Bank & Trust
Company, Atlanticus Services Corporation, and
Fortiva Financial, LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

    A.    The Bank, ASC, and Fortiva..................................................................3

    B.    Maryland's Regulatory Scheme.............................................................4

    C.    The Commissioner's Charge Letter .......................................................8

LEGAL STANDARDS .............................................................................................10

ARGUMENT ............................................................................................................10

    I.    THIS COURT HAS JURISDICTION BECAUSE THE COMMISSIONER'S CLAIMS ARE COMPLETELY PREEMPTED BY FEDERAL LAW. ................11

    A.    Section 27 of the FDIA Completely Preempts State-Law Claims for Unlawful Interest. ..............................................................................12

    B.    Count 2 Is Completely Preempted Because Charging Unlawful Interest Is an Essential Element of the Claim. .........................................................15

    C.    All the Commissioner's Claims Are Completely Preempted Because Maryland Enforces Its Rate Caps Through Licensing. ...........................17

    D.    The Commissioner's Arguments to Evade Federal Jurisdiction Are Unsupported By the Law and Belied By the Charge Letter. ..................19

    II.    BECAUSE FEDERAL INTERESTS PREDOMINATE, REMOVAL FROM THE OAH IS PROPER. ........................................................................21

    A.    *Kolibash* Adopts a "Functional Test" That Is Driven By the Federal Interests. ............................................................................................23

    B.    Because the Commissioner's Claims Are Completely Preempted, Federal Interests Are at Their Apex...................................................................25

    C.    When Federal Interests Predominate, Removal Is Proper Even From Tribunals Less Court-Like Than the OAH. .........................................27

    III.    *YOUNGER* ABSTENTION DOES NOT APPLY TO REMOVED PROCEEDINGS. ................................................................................32

    IV.    THE IS NO REASON FOR THE COURT TO DECLINE SUPPLEMENTAL JURISDICTION OVER THE CLAIMS AGAINST ASC AND FORTIVA. ............33

CONCLUSION...........................................................................................................34

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Aronson v. Cap. One Fin. Corp*.,
   125 F. Supp. 2d 142 (W.D. Pa. 2000).........................................................................13

*BankWest, Inc. v. Baker,*
   411 F.3d 1289 (11th Cir. 2005),
   *reh'g en banc granted, opinion vacated*, 433 F.3d 1344 (11th Cir. 2005),
   *reh'g order vacated*, No. 04-12420, 2006 WL 1329700 (11th Cir. Apr. 27, 2006),
   *and vacated as moot*, 446 F.3d 1358 (11th Cir. 2006) .................................................13

*Beneficial Nat'l Bank v. Anderson,*
   539 U.S. 1 (2003).........................................................................13, 14, 25, 26

*Beneficial Nat'l Bank v. Anderson*,
   2003 WL 1098993 (U.S. Amicus Brief, Mar. 7, 2003) ...............................................26

*In re Blackwater Sec. Consulting, LLC*,
   460 F.3d 576 (4th Cir. 2006) ...............................................................................22, 25

*In re Burns & Wilcox, Ltd.*,
   54 F.3d 475 (8th Cir. 1995) ...................................................................................33

*Caterpillar, Inc. v. Williams*,
   482 U.S. 386 (1987)................................................................................................10

*In re Cmty. Bank of N. Va.*,
   418 F.3d 277 (3d Cir. 2005)................................................................................ *passim*

*Com. of Va. ex rel. Kilgore v. Bulgartabac Holding Grp.*,
   360 F. Supp. 2d 791 (E.D. Va. 2005) .........................................................................32

*Conn. State Dental Ass'n v. Anthem Health Plans, Inc*.,
   591 F.3d 1337 (11th Cir. 2009) ...............................................................................17

*Discover Bank v. Vaden*,
   489 F.3d 594 (4th Cir. 2007), *rev'd & remanded*, 556 U.S. 49 (2009)............... *passim*

*Feldman's Med. Ctr. Pharm., Inc. v. CareFirst, Inc*.,
   723 F. Supp. 2d 814 (D. Md. 2010)...........................................................................17

*Floeter v. C.W. Transport, Inc.*,
   597 F.2d 1100 (7th Cir. 1979) ...............................................................................23, 27

*Fluke v. CashCall, Inc.,*
  792 F. Supp. 2d 782 (E.D. Pa. 2011) ...........................................................................13

*Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Tr. for S. Cal.*,
  463 U.S. 1 (1983) .................................................................................................. *passim*

*Ginn v. N.C. Dep't of Corr.,*
  829 F. Supp. 804 (E.D.N.C. 1993) ..............................................................................29

*Gottlieb v. Lincoln Nat'l Life Ins. Co.*,
  388 F. Supp. 2d 574 (2005) ..........................................................................................29

*Greenwood Trust Co. v. Comm. of Mass.*,
  971 F.2d 818 (1st Cir. 1992) .............................................................13, 14, 18, 26

*Grunbeck v. Dime Sav. Bank of New York, FSB,*
  74 F.3d 331 (1st Cir. 1996) ..........................................................................................13

*Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*,
  761 F.3d 1027 (9th Cir. 2014)  .............................................................7, 15, 16, 20

*Insurance Commissioner of Puerto Rico v. Doral Insurance Agency, Inc.*
  No. 05-2230-CCC, 2006 WL 3196472 (D.P.R. Nov. 2, 2006) ...................................26

*Kolibash v. Committee on Legal Ethics of W. Va. Bar,*
  872 F.2d 571 (4th Cir. 1989) ................................................................................ *passim*

*Kozachuk v. Md. State Bd. of Physicians*,
  No. 2294, 2017 WL 6371685 (Md. Ct. Spec. App. Dec. 13, 2017) ............................21

*Lontz v. Tharp,*
  413 F.3d 435 (4th Cir. 2005) ..........................................................................10, 22, 27

*Maryland Comm'r of Fin. Reg. v. Fortiva Fin. et al.*,
  No. LABOR-CFR-76-21-03142 ....................................................................................8

*Md. Comm'r of Fin. Reg. v. Western Sky Fin., LLC*,
  No. WDQ-11-0735, 2011 WL 4894075 (D. Md. Oct. 12, 2011) ...................23, 24, 31

*Martin v. Schwerman Trucking Co.*,
  446 F. Supp. 1130 (E.D. Wis. 1978)............................................................................27

*Metro. Life Ins. Co. v. Taylor*,
  481 U.S. 58 (1987)........................................................................................................10

*Nationwide Mutual Insurance v. New Hampshire Department of Labor*,
  No. 07-cv-241-PB, 2007 WL 2695387 (D.N.H. Sept. 12, 2007)  ..................25, 27, 30

*Negron-Fuentes v. UPS Supply Chain Sols.*,
  532 F.3d 1 (1st Cir. 2008) ........................................................................17

*New Cingular Wireless PCS, LLC v. Finley*,
  674 F.3d 225 (4th Cir. 2012) ...................................................................24

*N. Carolina ex rel. N. Carolina Dep't of Admin. v. Alcoa Power Generating, Inc.*,
  989 F. Supp. 2d 479 (E.D.N.C. 2013) ......................................................33

*Phipps v. FDIC*,
  417 F.3d 1006 (8th Cir. 2005) ...........................................................19, 20

*Phipps v. Guar. Nat. Bank of Tallahassee*,
  No. 03-420-CV-W-GAF, 2003 WL 22149646
  *aff'd sub nom. Phipps v. FDIC*, 417 F.3d 1006 (8th Cir. 2005) .................15

*Regan v. State Bd. of Chiropractic Examiners*,
  355 Md. 397 (1999) ..................................................................................21

*Rivet v. Regions Bank of La.*,
  522 U.S. 470 (1998) ..................................................................................10

*Rockville Harley-Davidson v. Harley-Davidson Motor Co.*,
  217 F. Supp. 2d 673 (D. Md. 2002) ..........................................................26

*Sawyer v. Bill Me Laer, Inc.*,
  23 F. Supp. 3d 13759 (D. Utah 2014) .......................................................13

*Smiley v. Citibank (S. Dakota), N.A.*,
  517 U.S. 735 (1996) ..................................................................................20

*Vill. of DePue v. Exxon Mobil Corp.*,
  537 F.3d 775 (7th Cir. 2008) ....................................................................33

*Volkswagen de Puerto Rico, Inc. v. Puerto Rico Lab. Relations Bd.*,
  454 F.2d 38 (1st Cir. 1972) .............................................................23, 27, 31

*Weso v. Menominee Indian Sch. Dist.*,
  915 F. Supp. 73 (E.D. Wis. 1995) .............................................................24

*Wilson v. Gottlieb*,
  821 F. Supp. 2d 778 (D. Md. 2011) .........................................22, 25, 28, 31

*Woodruff v. Hartford Life Group Insurance Co.*,
  378 F. Supp. 2d 546 (D. Md. 2011) ..........................................................29

*Zeeco, Inc. v. JPMorgan Chase Bank, N.A.*,
  No. 17-CV-384-JED-FHM, 2017 U.S. Dist. LEXIS 211158
  (N.D. Okla. Dec. 21, 2017) ......................................................................................33

## STATUTES AND OTHER MATERIALS

15A MOORE'S FED'L PRAC. – CIV. § 106.64 ................................................................34

16 MOORE'S FED'L PRAC. – CIV. § 107.75 ..................................................................25

12 U.S.C. § 85 ..............................................................................................................14
      § 86 ....................................................................................................................14
      § 1831d(a) .....................................................................................................12, 13
      § 1831d(b) ...........................................................................................................12

28 U.S.C. § 1331 ..........................................................................................................10
      § 1367(a) .............................................................................................................11
      § 1367(c) .............................................................................................................34
      § 1441(a) .............................................................................................................10
      § 1446(d) .............................................................................................................25


H.R. No. 80-308  (1947), A343–45, A430 ....................................................................24

CL § 12-302 ................................................................................................................6, 7
      § 12-314(b).................................................................................................6, 9, 12, 16
      § 12-314(b)(1) ........................................................................................................6
      § 12-903(a)(1) .....................................................................................................5, 6
      § 12-908(b) ...........................................................................................................19
      § 12-915 ..............................................................................................................6, 7
      § 12-916 ................................................................................................................9
      § 12-918 ................................................................................................................6
      § 12-918 (a)(2) .....................................................................................................12
      § 12-1015 ..............................................................................................................7
      § 12-1016 ..............................................................................................................9
      § 12-1018 ..............................................................................................................6
      § 12-1018 (b) ...................................................................................................12, 19


Md. Code Regs. § 09.01.03.08................................................................................30
      § 14.03.05.4(H)(11) ............................................................................................30
      § 28.02.01.11(A)(1) ............................................................................................30
      § 28.02.01.11(A)(3) ............................................................................................30
      § 28.02.01.11(B) .................................................................................................30
      § 28.02.01.11(B)(13) ..........................................................................................30


Md. Code, State Gov't § 9-1605(c) ......................................................................30
      § 10-207(a) ..........................................................................................................21

§ 10-207(b) .................................................................................21
§ 10-213 ...................................................................................30

Md. Code Ann., Fin. Inst. § 2-114(b) ...............................................30
§ 2-115(b) .................................................................................30
§ 11-101(d) .................................................................................6
§ 11-201 .....................................................................................7
§ 11-202(b) ........................................................................6-7, 17
§ 11-203 .....................................................................................7
§ 11-206(a) ...............................................................................7
§ 11-209(b) ...............................................................................8
§ 11-215(b) ..............................................................................10
§ 11-215(b)(1) ...........................................................................9
§ 11-302(b)(1) ...........................................................................6
§ 11-304 .....................................................................................7

## PRELIMINARY STATEMENT

This case has everything to do with enforcing Maryland's interest rate caps. That is why the Commissioner's claims are completely preempted and removal is proper.

The Bank of Missouri is a state-chartered, federally insured bank supervised by the Federal Reserve and the Missouri Division of Finance. Under federal law, only one state has any say in how much interest the Bank may charge and collect: the Bank's home state of Missouri. Section 27 of the Federal Deposit Insurance Act expressly preempts any other state's laws that regulate the amount of interest the Bank can charge. But Section 27 does more than that: it is one of the rare federal statutes that also *completely* preempts state laws.

Unlike ordinary preemption, complete preemption is a jurisdictional doctrine. It can only be triggered by federal laws with such extraordinary preemptive force that they convert nominal state-law claims into claims arising under federal law. Section 27 of the FDIA is one such law. As the Fourth Circuit has held, Section 27 completely preempts state-law claims for unlawful interest against a state bank. Thus, the remand issue here boils down to whether the Commissioner has brought such a claim. *See infra* Part I.A.

He has. *First*, the Commissioner's MCLL claim asserts that all of the Bank's loans to Maryland consumers are unenforceable, such that the Bank is prohibited from collecting the principal, interest, or any other money related to the loans. Under Section 314(b) of the MCLL, the fate of that remarkable claim turns on one thing: whether the Bank's consumer loans charged a rate of interest greater than authorized by Maryland law.

The Commissioner's Charge Letter sets out to support that dispositive element of the MCLL claim. It alleges the Bank made a consumer loan at 35.98% interest in 2016. It details that the applicable interest rate cap in Maryland is 24 percent. And it quotes the version of MCLL

Section 314(b) that makes such loans unenforceable. The caption of that law aptly describes the Commissioner's target: "Loans at greater than authorized rate of interest." *See infra* Part I.B.

*Second*, interest-rate regulation is integral to "licensing" in Maryland—getting a license requires state banks to commit to adhere to Maryland's rate caps. Getting a license also requires posting a surety bond conditioned on compliance with those caps. The Bank refused to make that commitment, post that bond, and get licenses. The consequence, according to Maryland's lending laws:  the Bank is barred from "collect[ing] any interest" at all. Under those laws, when the Bank charged and collected interest anyway, it did so unlawfully. *See infra* Part I.C.

Even so, the Commissioner insists on remand because the OAH is not a "State court" under Section 1441(a). But the Commissioner cannot evade federal jurisdiction over completely preempted claims by suing in the OAH. On this issue, the Fourth Circuit refuses to elevate form over substance; it rejected a literal test in favor of a functional one. And that functional test hinges not on the characteristics of the state tribunal but on a balancing of the federal and state interests. Here, the federal interests predominate—the Commissioner asserts claims that are completely preempted by federal law. For its part, the "quasi-judicial" OAH, which holds "adversarial, trial-like" hearings, is far more court-like than what is required when the federal interests predominate. *See infra* Part II.

Contrary to the Commissioner's assertions, the Court should not refrain from exercising its jurisdiction. *Younger* does not apply. That abstention doctrine requires a separate, ongoing state proceeding. It thus has no place in removal cases like this one. *See infra* Part III.

Nor should the Court exercise its discretion to decline supplemental jurisdiction over the claims against ASC and Fortiva. The Commissioner admits that those claims "arise from the same general controversy" as the claims against the Bank and that it brought the claims together for

"efficiency." There is no good reason—much less the requisite "compelling reasons"—to now unwind those related claims. *See infra* Part IV.

## BACKGROUND

A.    The Bank, ASC, and Fortiva

The Bank is a state-chartered, federally insured bank supervised by the Federal Reserve and the Missouri Division of Finance. It operates several nationwide loan programs and charges interest rates permitted by its home state—as Congress authorized under Section 27 of the FDIA.

The Bank has offered two credit products to consumers in Maryland: (i) credit card accounts (both general-purpose MasterCards and store-branded retail accounts); and (ii) unsecured personal consumer loans. (Charge Ltr., Dkt. No. 1-2, ¶¶ 6–7.) In August 2016, the Bank ended its personal consumer loan program in Maryland. (*Id.* at n.1.) It continues to offer credit card accounts to Maryland consumers (*Id.* ¶ 9.) The Commissioner asserts that, as of January 2018, the number of outstanding credit accounts the Bank has issued to Maryland consumers and their total balance was:

| Bank Product | # of Maryland Accounts | Total Outstanding Balance |
|---|---|---|
| Store-branded Retail Credit Financing | 3,990 | $5,088,879.01 |
| Store-branded Credit Cards | 3,025 | $2,097,985.68 |
| Fortiva-branded Personal Loan | 278 | $620,405.46 |

(*Id.* at 4.)

As the Charge Letter asserts, the Bank retains ownership of the "debtor-creditor relationship with Maryland consumers for the life of the loan account"; remains the "only entity

entitled to enforce the credit agreement[s]" with borrowers; and "controls the servicing and collections of loan accounts." (*Id.* ¶¶ 10, 20.)

To administer its lending programs, the Bank outsources several functions to service providers, including ASC, that carry out the Bank's directives. In its role as program manager, ASC performs various functions for the Bank like managing vendors; processing applications and remittances; and providing back-office support. ASC's Bank-directed functions also include, as the Commissioner puts it, verifying whether credit applicants "satisf[y] the eligibility requirements *established by the Bank*" and handling "documents pertaining to *the Bank's* credit applications and accounts." (*Id.* ¶¶ 13, 14 (emphasis added).) Thus, as the Charge Letter asserts, in "contrast" to the Bank, "Atlanticus . . . is not a lender and does not issue credit to Maryland consumers." (*Id.* ¶ 11.)

In several places, the Commissioner's remand brief mischaracterizes Defendants' roles in the Bank's lending programs. (*See* CFR Br. at 3–6.)[1] For three reasons, Defendants were surprised to see those assertions. They are false. They are contradicted by the Commissioner's assertions in the Charge Letter. And they are gratuitous: they have nothing to do with the jurisdictional issue now before the Court.

B.     Maryland's Regulatory Scheme

Maryland regulates extensions of credit to consumers under Title 12 of its Commercial Law. *See* Md. Code Ann. Com. Law ("CL"), Title 12 *et seq.* Here, the Commissioner invokes a trio of consumer lending laws against the Bank:

| Statute | Citation | Coverage |
|---|---|---|
| Maryland Consumer Loan Law ("MCLL") | CL § 12-301 *et seq.* | Loans to consumers of $25,000 or less. *See* CL § 12-303(a)(1). Before January 1, 2019, coverage under the MCLL was capped at |

---

[1] The brief even refers to the Bank's loans as "Defendants' loans." (*Id.* at 6.)

| | | $6,000.^{2}$ *See* CL § 12-303(a) (repealed). |
|---|---|---|
| Closed End Credit Provisions ("CLEC") | CL § 12-1001 *et seq.* | A single extension of closed-end credit. *See* CL § 12-1001(j). |
| Revolving Credit Provisions ("RCP") | CL § 12-901 *et seq.* | Revolving (*i.e.,* open-end) credit plans. *See* CL § 12-902. |

The MCLL, CLEC, and RCP provide comprehensive rules for the credit products within their scope—rules that regulate their terms, conditions, permissible interest, fees, and required disclosures. For each statute, the Charge Letter highlights the same two aspects of the statutory scheme: licensing and interest rate caps.

### 1. The Statutes' Rate Caps

The Charge Letter details the maximum permitted interest rates—the rate caps—under the MCLL and CLEC. (Charge Ltr. 6, 8.) For the MCLL, the Charge Letter reproduces the statute's caps and translates those caps to "maximum annual interest rate[s]"—caps that range from "24 percent" to "33 percent" depending on the size of the "unpaid principal balance." (Charge Ltr. at 6.) The Charge Letter also quotes CLEC's rate cap, which permits interest "not in excess of 24 percent per year." (*Id.* at 8.) The RCP's rate cap tracks the cap in CLEC. *See* CL § 12-903(a)(1) (limiting "interest or finance charges" on "outstanding unpaid indebtedness in the borrower's account" to an "effective rate of simple interest . . . not exceed[ing] 24 percent per year").

Violating the rate caps carries stiff penalties in Maryland. Under CLEC or RCP, a lender that exceeds the rate cap can "collect only the principal amount of the loan and may not collect any interest, costs, fees, or other charges with respect to the loan." CL § 12-918; CL § 12-1018. Penalties under the MCLL changed over time. Under the MCLL in effect through 2018, if an

---

[2] The MCLL was amended effective January 1, 2019. *See* Commercial Law—Consumer Loans And Credit—Miscellaneous Provisions, Ch. 790, Md. Sess. Laws (2018) (codified as amended at MCLL §§ 12-300 *et seq.*). Among the changes, the amendment increased the amount of the loans subject to the MCLL from $6,000 to $25,000, and changed the circumstances under which a loan is deemed unenforceable.

unlicensed lender charges interest in excess of the rate cap, the lender is "prohibited from collecting the principal amount of those loans from any . . . consumer[] or from collecting any other money related to those loans." (Charge Ltr. at 7–8, 11); *see also* CL § 12-314(b) (repealed).[3]

### 2. The Statutes' Licensing Regime

Maryland generally requires a license to offer products covered by the MCLL, RCP, or CLEC.[4] But there are exceptions. Under the CLEC and RCP, state banks chartered by Maryland are exempt from licensing. *See* FI § 11-302(b)(1); *id.* § 11-101(d). There is no exemption for state banks that, like the Bank, are chartered by other states. *See* FI § 11-302(b)(1).

The MCLL is different. The Commissioner is "without licensing powers" and "may not license any bank" to make consumer loans under the MCLL. Md. Code Ann. Fin. Inst. ("FI") § 11-202(b). The Commissioner asserts that banks are thus "prohibited from holding a consumer loan license," yet not exempt from the MCLL's requirements. (Ex. 3 at 1).[5]

---

[3] The prior version of MCLL Section 314, effective through December 31, 2018, as set forth in *Mitche's Annotated Code of the Public General Laws of Maryland*, § 12-314 (2013), is attached as Appendix A. Effective January 1, 2019, the legislature amended Section 314 so that a loan is void and unenforceable if the interest rate violates the rate caps or the lender is unlicensed. *See* CL § 12-314(b)(1). The Charge Letter does not recite the amended statute or mention this aspect of the amendment.

[4] *See* CL § 12-302 (requiring license to lend under MCLL in accordance with Title 11, Subtitle 2 of the Financial Institutions Article); *id.* §§ 12-915, 12-1015 (requiring licenses to lend under RCP and CLEC in accordance with Title 11, Subtitle 3 of the Financial Institutions Article).

[5] Exhibits cited refer to the exhibits to the Declaration of Jonathan M. Watkins. When a defendant asserts that a claim is completely preempted, examination of extra-pleading material is permitted. *See Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027, 1035 (9th Cir. 2014).

The Commissioner issues MCLL, RCP, and CLEC licenses and adopting "rules and regulations" governing the process.[6] *See* FI § 11-203. The Commissioner maintains a licensing website. (*See* Exs. 1, 2.) That website says that "[a]pplicants and licensees" are expected to be "knowledgeable about and in compliance with" the MCLL, CLEC, and RCP, among other federal and state laws. (*Id.*) For MCLL license applicants, the Commissioner states, for example:

---

**Laws, Rules, and Regulations**

Applicants and licensees are expected to be knowledgeable about and in compliance with the Consumer Loan Law, and any other applicable State or Federal statutes, rules, and regulations. Maryland laws, rules, and regulations can be found by accessing the Annotated Code of Maryland and Rules and Code of Maryland Regulations (COMAR).  Certain relevant Maryland laws, rules, and/or regulations include (Note: this is not a comprehensive list):

- Maryland Code, Commercial Law Article, Title 12, Subtitle 1 (Interest and Usury)
- Maryland Code, Commercial Law Article, Title 12, Subtitle 3 (Consumer Loans – Credit Provisions)
- Maryland Code, Commercial Law Article, Title 12, Subtitle 9 (Credit Grantor Revolving Credit Provisions)
- Maryland Code, Commercial Law Article, Title 12, Subtitle 10 (Credit Grantor Closed End Credit Provisions)
- Maryland Code, Financial Institutions Article, Title 11, Subtitle 2 (Consumer Loans – Licensing Provisions)
- COMAR 09.03.02 (General Regulations)
- COMAR 09.03.02.08 (Remote Work for Employees of Licensees)
- COMAR 09.03.10 (Credit and Other Regulation)

---

That expectation is backed up by Maryland law. Every license application requires a (a) "Control Person (MU) Attestation" and (b) surety bond. (Exs. 3, 4 at 5–6); *see also* FI § 11-206(a), (c). The attestation must be signed and filed by an executive officer of the applicant. And it requires the applicant to represent the truth and completeness of "the information and

---

[6] The process for obtaining a license to lend under the MCLL, RCP, and CLEC is set out in Title 11 of Maryland's Financial Institutions Article. An MCLL license—known as a consumer loan license—is governed by Subtitle 2 of that Article. *See* CL § 12-302. A license under the RCP and CLEC—known as an installment loan license—is governed by Subtitle 3 of the Article. CL §§ 12-915, 12-1015. That subtitle, however, states that "[a] license under [Subtitle 3] shall be applied for an issued in accordance with, and is subject to, the licensing and investigatory provisions of Subtitle 2 of this title." FI § 11-304. Thus, the licensing process for each of the MCLL, RCP, and CLEC is governed by Subtitle 2. *See* FI §§ 11-201 *et seq*.

statements" in the application. (Ex. 5 at 3.) It commits the applicant, under penalty of perjury, to "comply with the provisions of law" "pertaining to the conduct of business for which the applicant is applying." (*Id.*)[7]

The surety bond includes the same commitment, but with more detail—requiring the applicant to "while this bond is in force and effect comply with *all provisions*" of the MCL, RCP, and CLEC. (Exs. 7, 8 (emphasis added).) Because the surety bond is submitted with the application, it is also subject to the attestation of truthfulness and made under penalty of perjury. (Ex. 5 at 3.)

### C.    The Commissioner's Charge Letter

On January 21, 2021, the Commissioner sued the Bank, its program manager ASC, and ASC's wholly owned subsidiary, Fortiva, in the Maryland Office of Administrative Hearings.[8] The Commissioner alleges that the Bank made loans and charged interest under the MCLL, RCP, and CLEC without a license. (*See* Charge Ltr., Counts 1–3.)

But the Commissioner charges more than that. This action stems from "a consumer complaint" by Ms. Loretta Alexander (*Id.* ¶¶ 1, 2.) The "OCFR's investigation revealed that" the Bank had made a consumer loan to Ms. Alexander in 2016 "in the amount of $5,000" at "an annual percentage rate of 35.98% payable over 48 months." (*Id.* ¶ 2.) The Commissioner alleges that the interest the Bank charged to Ms. Alexander exceeded the rate cap under the MCLL and CLEC. As the Commissioner points out in the "Applicable Laws" supporting his charges:

- "CL § 12-306 specifies the maximum interest rates which a lender is permitted to charge on a loan under . . . the [MCLL] . . . . This section only permits a lender to charge a maximum annual interest

---

[7] These commitments must be reaffirmed annually for licenses to be renewed. *See* FI § 11-209(b); (Ex. 9 at 2.)

[8] *See Maryland Comm'r of Fin. Reg. v. Fortiva Fin. et al.*, No. LABOR-CFR-76-21-03142.

rate of 24 percent on the unpaid principal balance of the loan." (*Id.* at 6.)

- Under "CL § 12-1003(a), an installment loan lender may charge and collect interest on an loan . . . if the effective rate of simple interest is not in excess of 24 percent per year." (*Id.* at 8.)

The Commissioner also alleges that the Bank's loans "to all Maryland consumers" are "unenforceable" under the MCLL such that the Bank is "prohibited from collecting the principal amount of those loans from any of these consumers or from collecting any other money related to those loans. (*Id.* at 11, Count 2.) This allegation echoes the Commissioner's statement in the Motion to Remand that "all of Defendants' loans to Maryland consumers are unenforceable[.]" (CFR Br. at 6.) To state a claim for unenforceability under the MCLL in effect through 2018, the lender must be unlicensed and charge "a rate of interest, charge, discount, or other consideration greater than that authorized by the laws of [Maryland] is contracted for by any person " (*See* Charge Ltr. at 7–8 (quoting CL § 314(b) (repealed).)

The Commissioner seeks "fines, penalties, and sanctions" based on any "violation of the above referenced provisions of law"—namely the entire MCLL, RCP, and CLEC. He asserts that such violations entitle him to restitution and disgorgement of interest and fees collected. (*See* Charge Ltr. at 12.) The Commissioner also asserts that he can issue a cease and desist order that would impede the Bank's lending, (*see id.*); *see also* CL §§ 12-916, 12-1016; FI § 11-215(b)(1). According to the Commissioner, he can also impose hefty civil penalties on the Bank—$10,000 for a first violation and up to $25,000 for each subsequent violation—for exercising its power to charge home-state interest nationwide. FI § 2-115(b).

For their part, ASC and Fortiva are accused of being unlicensed credit services businesses and unlicensed collection agencies. (*See* Charge Ltr. at 11.) While unprecedented and unsupported, those accusations are not germane to the Commissioner's remand motion.

## LEGAL STANDARDS

Any civil action brought "in a State court" may be removed if "the district courts of the United States have original jurisdiction" over it. 28 U.S.C. § 1441(a). Federal courts have original jurisdiction when a civil action arises under federal law. 28 U.S.C. § 1331. That inquiry "is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475 (1998).

Complete preemption is an "independent corollary to the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987). Unlike ordinary preemption, *complete* preemption "is a *jurisdictional* doctrine." *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005) (emphasis added). It stems from the principle that "a plaintiff may not defeat removal by omitting to plead necessary federal questions." *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 22 (1983).

Complete preemption is narrow yet potent: it can only be triggered by a federal law with "preemptive force" "so extraordinary" that it "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987). When triggered, complete preemption establishes "arising under" jurisdiction over the state-court action: "Once an area of law has been completely preempted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.*

## ARGUMENT

Because the Commissioner's claims are completely preempted by Section 27 of the FDIA, this Court has original jurisdiction. *See infra* Part I.

Still, the Commissioner asserts that even completely preempted claims must be remanded because they were not removed from "State court." That literal argument fails under the Fourth Circuit's "functional test." When, as here, federal interests predominate, the OAH is more than "adjudicatory" enough to qualify as a State court. *See infra* Part II.

The claims against ASC and Fortiva should also remain here. They "are so related" to the claims against the Bank as to "form part of the same case or controversy," 28 U.S.C. § 1367(a). *See infra* Part III.

Nor can the Commissioner evade the federal courts through *Younger* abstention. In removed cases like this one, *Younger* does not apply because there is no "*ongoing* state judicial proceeding." *See infra* Part IV.

## I.   THIS COURT HAS JURISDICTION BECAUSE THE COMMISSIONER'S CLAIMS ARE COMPLETELY PREEMPTED BY FEDERAL LAW.

Section 27 of the FDIA completely preempts "any state law," no matter its moniker, "attempting to limit the amount of interest and fees a federally insured state chartered bank can charge." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 295 (3d Cir. 2005). *See infra* Part I.A.

The state laws marshalled against the Bank here do just that, and the Commissioner's claims purportedly based on those state laws therefore arise under federal law. *First*, the Commissioner's MCLL claim asserts that "all of [the Bank's] loans to Maryland consumers are *unenforceable*, such that [the Bank is] prohibited from collecting the principal amount of those loans or any other money related to them." (CFR Br. at 6; *see* Charge Ltr. at 11 (Count 2).) That claim hinges on one thing: the Bank charging "a rate of interest . . . greater than that authorized by the laws of this State." (Charge Ltr. at 7 (quoting CL 12-314(b)); *see id.* at 11 (Count 2, charging under CL 12-314(b)).) Thus, the case for complete preemption of that claim could hardly be more clear. And complete preemption of that claim alone is enough for federal jurisdiction over this

case: when even a single claim is completely preempted, "removal [i]s proper as to the whole case." *Franchise Tax*, 463 U.S. at 13. *See infra* Part I.B.

*Second*, the Commissioner's CLEC and RCP claims are also completely preempted. Those laws try to enforce rate caps by Hobson's choice. To avoid litigation, state banks wishing to make installment loans or offer revolving credit in Maryland must secure a license. But doing so requires even state banks to commit, under penalty of perjury, to abide by Maryland's rate caps. And that is not all: even state banks must also post a $50,000 surety bond "conditioned" on adherence to those caps. Because the Bank refused to do so, the Commissioner sued to ban the Bank from collecting interest on installment loans and revolving credit. *See* CL §§ 12-918(a)(2) (providing that unlicensed lenders "may collect only the credit extended of the loan and may not collect any interest, costs, fees, or other charges with respect to the credit extension"); 12-1018(b) (same). Because only Missouri has any say in how much interest the Bank may charge, these claims are completely preempted too. *See infra* Part I.C.

A.    <u>Section 27 of the FDIA Completely Preempts State-Law Claims for Unlawful Interest.</u>

Only four federal statutes are capable of triggering complete preemption. The FDIA is one of them.[9]

Congress passed Section 27 of the FDIA "to prevent discrimination" against state banks "with respect to interest rates." 12 U.S.C. § 1831d(a).[10] Section 27 does three things. It grants state banks federal authority to lend across state lines at their home-state interest rate—a power long enjoyed by national banks. *See* 12 U.S.C. § 1831d(a). It expressly preempts "any" contrary "State

---

[9] The other statutes are Section 301 of the Labor Management Relations Act, Section 502 of ERISA, and Sections 85 and 86 of the National Bank Act.

[10] Section 27 of the FDIA is codified at 12 U.S.C. § 1831d and is also known as Section 521 of the Depository Institutions Deregulation and Monetary Control Act (DIDA or DIDMCA), the act that amended the FDIA to include Section 27. Section 27 is attached as Appendix B.

constitution or statute." *Id.* And it creates a federal cause of action against a state bank for charging interest that "exceeds the rate" allowed by Section 27—*i.e.,* the bank's home state interest rate. *See id.* § 1831d(b).

Section 27 is powerful. Federal courts have long held that it expressly preempts any "law or regulation enacted in the borrower's home state [that] purposes to inhibit the bank's choice of an interest term." *Greenwood Trust Co. v. Comm. of Mass.*, 971 F.2d 818, 827 (1st Cir. 1992). Or as Judge Carnes put it in his opinion dissenting from the Eleventh Circuit's now-vacated panel decision in *BankWest, Inc. v. Baker*, the "preemptive command" of Section 27 "is clear"—"any State constitution or statute" that attempts to "define, condition, impinge upon, regulate, restrict, or otherwise affect the right of an out-of-state bank to charge an interest rate permitted under the laws" of its home state "is preempted."[11]

Federal courts also hold that Section 27 is one of the rare federal statutes so "extraordinary" that it "displace[s] entirely any state cause of action." *Franchise Tax*, 463 U.S. at 23. Section 27 of the FDIA is modeled on Sections 85 and 86 of the National Bank Act, and the statutes are interpreted *in pari materia*.[12] In *Beneficial National Bank v. Anderson*, the Supreme Court held

---

[11] 411 F.3d 1289, 1315 (11th Cir. 2005) (Carnes, J., dissenting), *reh'g en banc granted, opinion vacated*, 433 F.3d 1344 (11th Cir. 2005), *reh'g order vacated*, No. 04-12420, 2006 WL 1329700 (11th Cir. Apr. 27, 2006), *and vacated as moot*, 446 F.3d 1358 (11th Cir. 2006); *see also Grunbeck v. Dime Sav. Bank of New York, FSB*, 74 F.3d 331, 338 (1st Cir. 1996) (Under Section 27, "Congress preempted all state legislation 'with respect to interest rates' in order to protect federally insured State-chartered banks from State regulation of credit card transactions."); *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1370 (D. Utah 2014) ("Section 27 represents Congress's considered judgment that banks . . . should be entitled to charge interest as allowed by the laws of their home states."); *Fluke v. CashCall, Inc.,* 792 F. Supp. 2d 782, 784 (E.D. Pa. 2011) (holding that Section 27 authorized a Delaware bank "to charge an out-of-state borrower . . . any interest rate that it could validly charge a Delaware borrower"); *Aronson v. Cap. One Fin. Corp.*, 125 F. Supp. 2d 142, 146 (W.D. Pa. 2000) (holding "[Section 27] permits the Bank to export the fees, lawful in Virginia, to Pennsylvania . . . plaintiff's claims are therefore preempted by DIDA").

[12] *See, e.g.*, *Greenwood*, 971 F.2d at 821 ("The historical record clearly requires a court to read the parallel provisions of [the FDIA] and the Bank Act *in pari materia*."); *In re Cmty. Bank of N.*

that Sections 85 and 86 of the NBA completely preempted claims that a national bank charged "excessive interest" in violation of Alabama law. 539 U.S. 1, 9–10 (2003). Like Section 27 of the FDIA, Sections 85 and 86 of the NBA authorize a national bank to charge home-state interest on "any loan" and provide a federal cause of action against a national bank for "charging a rate of interest greater than is allowed" by Section 85. *See* 12 U.S.C. § 85, 86.[13] The *Beneficial* Court explained that these provisions have the "requisite preemptive force" to "supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is *exclusive*." 539 U.S. at 11 (emphasis added). As a result, any state law "within the scope" of the NBA's exclusive federal remedy is "completely preempted." *Id.* at 8.

The Fourth Circuit has applied this same logic to Section 27. Noting "the virtual identity of the preemption language in the NBA and that of the FDIA, and the Supreme Court's finding of complete preemption under the NBA," the Fourth Circuit concluded that a state-court action for "fees and interest rates in violation of Maryland laws" was completely preempted by Section 27. *Vaden*, 489 F.3d at 606–07. The Third Circuit likewise concluded that Section 27 "completely preempts any state law attempting to limit the amount of interest and fees a federally insured state chartered bank can charge." *In re Cmty. Bank of N. Va.*, 418 F.3d at 295–96.

To determine whether a state-law claim is completely preempted by the federal banking laws, courts look to "the nature of the allegations in the complaint, rather than the parties' designations thereof." *Phipps v. Guar. Nat. Bank of Tallahassee*, No. 03-420-CV-W-GAF, 2003 WL 22149646, at *5–6 (W.D. Mo. Sept. 17, 2003), *aff'd sub nom. Phipps v. FDIC*, 417 F.3d 1006 (8th Cir. 2005). As the Ninth Circuit later confirmed, "[f]ederal courts are not bound by the labels

---

*Virginia*, 418 F.3d 277, 296 (3d Cir. 2005) (holding that the NBA and FDIA are interpreted "in the same way"); *Vaden*, 489 F.3d at 605–06 (holding that the FDIA and NBA are construed *in pari materia*).

[13] Sections 85 and 86 of the NBA are attached as Appendix C.

that litigants attach to completely preempted claims." *Hawaii ex rel. Louie v. HSBC Bank of Nevada*, 761 F.3d 1027, 1036 (9th Cir. 2014).

That means complete preemption under the FDIA and NBA "boils down to whether the plaintiffs brought *a claim of unlawful interest* charged by the defendants, notwithstanding the plaintiffs' protestations." *Phipps*, 417 F.3d at 1011 (emphasis added). Put another way, "when a plaintiff alleges that a . . . bank charged a rate of interest greater than is allowed, the claim falls within the scope of" Section 27's exclusive federal remedy, "regardless of the state law term invoked." *Hawaii ex rel. Louie*, 761 F.3d at 1036.

    B.    <u>Count 2 Is Completely Preempted Because Charging Unlawful Interest Is an Essential Element of the Claim.</u>

Count 2 charges the Bank with violating Section 314(b) of the MCLL. (Charge Ltr. at 11.) The Commissioner alleges that the Bank "made consumer loans in Maryland without being licensed to do so." (*Id.*) He then asserts that the Bank's "loans to all Maryland consumers" are "unenforceable" and that the Bank "may not receive or retain any principal interest, or other compensation with respect to" any such "unenforceable" loan.

But the language of Count 2 skips a step. The version of MCLL Section 314(b) in place during the period charged in the Charge Letter provides:

> (1) A loan made in the amount of $6,000 or less, whether or not the loan is or purports to be made under this subtitle, is unenforceable if a rate of interest, charge, discount or other consideration greater than that authorized by the laws of this State is contracted for by any person unless the excess rate contracted for is the result of a clerical error or mistake and the person corrects the error or mistake before any payment is received under the loan.
> (2) The person who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection.

(*Id.* at 7–8 (quoting CL § 12-314(b) (repealed).)

Under the plain terms of the statute reproduced verbatim by the Commissioner, a loan is unenforceable under the MCLL "*if* the rate of interest [is] greater than that authorized by the laws of this State." (*Id.* (emphasis added).) And only then is an unlicensed lender prohibited from "receiv[ing] or retain[ing] any principal, interest, or other compensation with respect to the loan." (*Id.*) The Commissioner must therefore prove two essential elements to trigger the MCLL's "prohibit[ion]" on collecting any money "with respect to" the loan: (i) the rate of interest charged must "be greater than authorized by" Maryland law, and (ii)  the lender must be unlicensed. *See* CL § 12-314(b) (repealed).

There can be no doubt that the Commissioner has asserted a claim that is completely preempted by Section 27: violating MCLL's rate caps is an *essential element* of the Commissioner's claim under MCLL Section 314(b). And the Charge Letter alleges facts to back up that essential element—it details the Bank's 2016 loan of $5,000 to Ms. Alexander at 35.98% APR and how that interest rate exceeds the MCLL's "maximum annual interest rate of 24%" on a loan of that size. (Charge Ltr. at 3, 7.)

 In fact, when it comes to the Bank, exceeding the rate cap is not just an essential element of a Section 314(b) claim, it is the only element. Under the MCLL, the Commissioner is "without . . . powers" to license any bank. *See* FI § 11-202(b).[14] In the Commissioner's own words, banks are therefore "prohibited from holding a consumer loan license" to lend under the MCLL. (Ex. 3 at 1.) The Commissioner, however, distinguishes between a licensing *prohibition* and a licensing *exemption*. The existence of this lawsuit shows well enough the Commissioner's view that banks "[are] not exempt from" licensing under the MCLL. (Charge Ltr. at 11 (Count 2).) As a result, the

---

[14] It is thus evident that this claim is not about licensing at all.

second element of Section 314(b)—that the lender is unlicensed—will always be satisfied. When it comes to banks, the first element of Section 314(b)—that the lender exceeded the MCLL's rate caps—is thus not only essential, it is dispositive.

Count 2 is thus precisely the sort of claim that the Fourth Circuit and other courts hold to be completely preempted under Section 27: a claim over "interest rates . . . in violation of Maryland laws." *Vaden*, 489 F.3d at 606–07. *See also Phipps*, 417 F.3d at 1011 (holding that NBA completely preempts "a claim of unlawful interest charged by the defendants"); *Hawaii ex rel. Louie*, 761 F.3d at 1036 (allegation that a national bank charged "a rate of interest greater than is allowed" would be completely preempted); *In re Cmty. Bank of N. Va.*, 418 F.3d at 295 (holding that Section 27 "completely preempts any state law attempting to limit the amount of interest and fees a federally insured state chartered bank can charge").

For these reasons, Count 2 is completely preempted. And "complete preemption of any one" claim is enough "to provide a federal forum." *Vaden*, 489 F.3d at 606 n.16. Removal is therefore "proper as to the whole case." *Franchise Tax Bd.*, 463 U.S. at 13.[15]

C. All the Commissioner's Claims Are Completely Preempted Because Maryland Enforces Its Rate Caps Through Licensing.

While complete preemption of just one claim is sufficient, all three of the Commissioner's claims against the Bank are completely preempted.

---

[15] *See Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1353 (11th Cir. 2009) ("[W]here removal jurisdiction exists over a completely preempted claim, the district court has jurisdiction over any claims joined with the preempted claim"); *Negron-Fuentes v. UPS Supply Chain Sols.*, 532 F.3d 1, 7 (1st Cir. 2008) (explaining that "any of [the plaintiff's] claims, if completely preempted, can support removal of the entire action"); *Feldman's Med. Ctr. Pharm., Inc. v. CareFirst, Inc.*, 723 F. Supp. 2d 814, 821 (D. Md. 2010) ("When removal jurisdiction exists over a completely preempted claim, the district court has jurisdiction over any claims joined with the preempted claim." (cleaned up)).

In Maryland, interest-rate regulation is integral to licensing. No matter their label, Maryland's licensing laws present state banks a Hobson's choice: get licensed on the Commissioner's terms or litigate. But getting licensed forces state banks to commit—under penalty of perjury and threat of "administrative action and/or criminal action"—to adhere to Maryland's lending laws, including its rate caps. (*See supra* Stmt. Facts, § B.2.) And that commitment is backed by a surety bond conditioned on compliance with those laws—including their rate caps. (*Id.*) Getting a license thus requires—whether by contractual commitment or to avoid criminal, administrative, and financial consequences—state banks to adhere to Maryland's rate caps.

It is true that not all licensing laws must be completely preempted by Section 27—it is easy enough to imagine licensing regimes that have nothing to do with interest, much less force state banks to adhere to rate caps. Yet the converse is also true: not every law given the label "licensing" can evade complete preemption. The complete preemption analysis does not turn on the label affixed by the state. *See supra* Part I.A. What matters is the substance: any "state law"—no matter its name—"attempting to limit the amount of interest and fees a federally insured state chartered bank can charge," is "completely preempt[ed]." *In re Cmty. Bank of N. Va.*, 418 F.3d at 295; *see also Greenwood*, 971 F.2d at 827 ("To the extent that a law or regulation . . . inhibit[s] the bank's choice of an interest term under section [27], [the FDIA] expressly preempts the state law's operation."); *see also Vaden*, 489 F.3d at 605-06 ("find[ing] the logic of our sister circuits" in *Community Bank* and *Greenwood* "compelling"). By attempting to commit state banks to adhere to its rate caps, that is just what licensing under the MCLL, RCP, and CLEC do here.

That point is underscored by state banks' only alternative to getting a license and submitting themselves to Maryland's interest rate caps: face the charges that the Commissioner

has brought here. Those charges seek to deprive the Bank of its right to charge home-state interest

nationwide. In fact, each of the Commissioner's charges would bar the Bank from collecting *any*

interest on its loans.[16]

Not only does the Commissioner allege that the Bank's consumer loans are unenforceable

(Count 2), he claims that because the Bank made installment loans (Count 1) and offered revolving

credit (Count 3) unlawfully—i.e., without a license. And for that reason, the Bank "may collect

only the principal amount of the loan and may not collect any interest, costs, fees, or other charges

with respect to the loan." CL §§ 12-908(b), 12-1018(b). The Commissioner also claims that

because interest has been charged unlawfully, he is entitled to "correct [all the alleged] violations"

by, among other things, ordering "restitution of all . . . interest . . . paid" to date. (Charge Ltr. at

12.) As in *Phipps v. FDIC*, 417 F.3d 1006, 1011 (8th Cir. 2005), the "remand issue here boils

down to whether the plaintiffs brought a claim of unlawful interest charged by the defendants,

notwithstanding the plaintiffs' protestations" over monikers. And that is precisely what the

Commissioner alleged in Counts 1 and 3. Because the Commissioner has brought a claim of

unlawful interest, for this reason too his claims are completely preempted.

D.   The Commissioner's Arguments to Evade Federal Jurisdiction Are Unsupported By
     the Law and Belied By the Charge Letter.

The Commissioner makes three main arguments. They are all wrong. *First*, the

Commissioner asserts that Section 27 only preempts rate "caps" and "usury provisions." (CFR Br.

---

[16] It makes no difference that the charges seek to ban all interest—a de facto zero-percent cap—
rather than seek to enforce a nonzero cap. In *Greenwood*, for example, the First Circuit held that a
complete ban on late fees—which it found to be a type of "interest"—was expressly preempted by
Section 27. 971 F.2d at 830-31 (explaining that "the scope of section [27] preemption" goes "well
beyond periodic interest rates"); *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 737
(1996) (holding that federal lending law authorizes a bank to charge late-payment fees lawful in
the bank's home state but prohibited in the states where the cardholders reside.)

16.) He cites nothing to support that proposition. *See id*. For good reason: it flouts the well-established rule that whether a state-law claim is completely preempted by the federal banking laws turns on whether the claim substantively alleges unlawful or excessive interest—not the plaintiff's particular characterization of his claim. *See Vaden*, 489 F.3d at 606–607; *Hawaii*, 761 F.3d at 1036; *Phipps*, 417 F.3d at 1009; *Community Bank*, 418 F.3d 277, 295–296.

*Second*, the Commissioner says, incredibly, that the Charge Letter includes "no allegation about unlawful interest rates," "no reference to an interest rate cap," and "only seeks to enforce the licensing and consumer protection provisions" of "relevant statutes." (CFR Br. at 16.)[17] None of these assertions are true. The MCLL charge *hinges on* the Bank charging a rate of interest that exceeds the MCLL's rate cap. *See supra* Part I.B. The rest of the Charge Letter also drives the point home.

The Charge Letter's "factual allegations" begin by conceding that this case sprung from Ms. Alexander's consumer complaint and the OCFR's conclusion that in 2016 the Bank loaned her $5,000 at an interest rate of 35.98%. (Charge Ltr. ¶¶ 1-2.) And when the Charge Letter moves on to describe the "Applicable Laws," it details the MCLL's rate caps.[18] It first reproduces the statute's caps, which are expressed in "interest per month." *Id.* at 6. To leave no doubt that rate on the loan to Ms. Alexander exceeded those caps, it then translates those caps to "maximum annual

---

[17] The Commissioner suggests that another feature of his case is that the Bank made loans without being "registered with the Maryland State Department of Assessment and Taxation." (Charge Ltr. ¶ 3.) Not so: none of the Commissioner's claims rests on the Bank allegedly being unregistered to do business. This too is for good reason—whether the Bank is registered to do business is inconsequential under every statute referenced in the Charge Letter. *Compare id.* at 11 (citing statutes regulating lending activities of "persons") *with* FI § 1-101(t) (defining a "person" as any individual or legal entity, without reference to registration).

[18] The Charge Letter also sets out CLEC's rate cap, which permits "interest . . . . not in excess of 24 percent per year," (*id.* at 8); Section 12-308, which covers statements to borrowers reflecting the interest charged under Section 12-306; and other interest-related statutes that, as applied to the Bank, are completely preempted by Section 27 of the FDIA, (*see id.* at 6–7).

interest rate[s]" and makes clear that the law "only permits a lender to charge a maximum annual interest rate of 24 percent" on a "loan with an original principal balance of more than $2,000"—a loan like Ms. Alexander's. (*Id.* at 6.)

Thus, these allegations of unlawful interest—complete with references to rate caps—not only appear in the Charge Letter, they comprehensively support the dispositive element of the Commissioner's charge under Section 314(b) of the MCLL.

Indeed, those allegations are so comprehensive that, under the OAH's liberal "gist" pleading standard, they are enough to support yet another claim that the Bank violated Maryland's interest rate caps. *See* Md. Cod Ann., State Gov't § 10-207(a), (b) (requiring "sufficient notice" of "the facts that are asserted" and "the pertinent statutory and regulatory sections under which the agency is taking its action."); *Kozachuk v. Md. State Bd. of Physicians*, No. 2294, 2017 WL 6371685, at *11 (Md. Ct. Spec. App. Dec. 13, 2017) (holding that notice is sufficient as long as "'the gist of the charges . . . and the gist of the [agency's] findings'" are the same) (*quoting Regan v. State Bd. of Chiropractic Examiners*, 355 Md. 397, 417–18 (1999)).

*Third,* the Commissioner claims that the Bank can raise "federal usury defenses" in the OAH, (CFR Br. at 13). If Section 27 were only capable of ordinary preemption, that would be right: ordinary preemption is "a mere defense" that can be raised in a state forum. But because Section 27 *completely* preempts, a state bank with a "federal usury defense" is precisely what "transforms the . . . state-law claims into federal claims." *Lontz*, 413 F.3d at 441.

## II.   BECAUSE FEDERAL INTERESTS PREDOMINATE, REMOVAL FROM THE OAH IS PROPER.

According to the Commissioner, even completely preempted claims must be remanded if they were first brought in the OAH. To support that proposition, the Commissioner focuses on the characteristics of the OAH and courts. The tribunals' differences, says the Commissioner, establish

that the OAH is not the sort of "State court" from which Section 1441(a) authorizes removal. Under the Commissioner's reasoning, that alone deprives the Bank of a federal forum in which to litigate even completely preempted claims against it. Not so.

The Commissioner errs by hinging its analysis on how the OAH differs from literal courts. Courts in the Fourth Circuit do not apply the literal test—a test under which courts look no further than whether the claims were filed in a state court. They instead apply the so-called functional test. Under that test, the state tribunal must have a "minimum of court-like functions that suffice"—a threshold that can be met even when removal is from an executive agency that "is obviously not a court." *Wilson v. Gottlieb*, 821 F. Supp. 2d 778, 791 (D. Md. 2011). Yet "[t]he form that the state action takes is not controlling." *Kolibash*, 872 F.2d at 576. Instead, the functional test turns on something else: the balancing of federal and state interests. As even Plaintiffs' cases concede, that balancing is the "more critical inquiry," *Gottlieb v. Lincoln Nat'l Life Ins. Co.*, 388 F. Supp. 2d 574, 581 (2005) (cited in CFR Br. *passim*). Indeed, that balancing doesn't merely inform whether a tribunal is a "State court," it controls. *See infra* Part II.A.

Here, federal interests sharply predominate. The complete preemption of the Commissioner's state-law claims "*evince[s] such a strong federal interest* that" they are "convert[ed]" into claims arising under federal law. *In re Blackwater Security Consulting, LLC*, 460 F.3d 576, 584 (4th Cir. 2006) (emphasis added). The Commissioner's assertion that the "federal interest . . . is slight" ignores Section 27's completely preemptive force and the congressional imperatives behind it. (CFR Br. at 13.) As for the state interest, Maryland can have no legitimate interest in bringing claims that are completely preempted. *See infra* Part II.B.

Given the predominant federal interest, the OAH far surpasses the "minimum of court-like functions that suffice." *Wilson*, 821 F. Supp. 2d at 791. It is more court-like than the State Bar Association disciplinary proceeding in *Kolibash* and the Maryland Health Claims Alternative

Dispute Resolution Office in *Wilson*, for example. Yet even in those cases, the courts rejected remand and held that the state tribunal sufficed as a "State court" for removal purposes. By relying exclusively on a smattering of cases where *state interests* predominated, the Commissioner whitewashes the pivotal role played by the federal-state balancing. *See infra* Part II.C.

A.     *Kolibash* Adopts a "Functional Test" That Is Driven By the Federal Interests.

The Fourth Circuit was presented with the choice between the functional and literal tests in *Kolibash*—a controlling decision conspicuously absent from the Commissioner's brief. The Ninth and Tenth Circuits have adopted the literal test, which focuses on semantics to foreclose removal from administrative agencies, no matter the context.

The functional test, by contrast, hinges on balancing the federal and state interests. Under that test—a test adopted by the First, Fourth, and Seventh Circuits[19]—removal is from a "State court" so long as the federal interests predominate and the tribunal operates in an adjudicatory manner. *Kolibash*, 872 F.2d at 576. In rejecting the literal test, the Fourth Circuit reasoned that when an important federal policy is at issue, that policy "should not be frustrated by a 'narrow, grudging interpretation' of the statute." *Id.* In fact, when the federal interests predominate, relying on a tribunal's characteristics "to hold [a] proceeding outside the operating of the removal statute would be to elevate form over substance." *Id.* The Fourth Circuit thus not only adopted the functional test, it highlighted the primary role played by the federal-state balancing.

In *Kolibash*, the matter was removed from a West Virginia State Bar Association disciplinary proceeding—a tribunal far less court-like than the OAH. Even so, it held that given the prevailing federal interest, the defendant could not be deprived of a federal forum based on the state bar disciplinary tribunal not being a "State court."

---

[19] *See Floeter v. C.W. Transport, Inc.*, 597 F.2d 1100, 1102 (7th Cir. 1979); *Volkswagen de Puerto Rico, Inc. v. Puerto Rico Lab. Relations Bd.*, 454 F.2d 38, 43-45 (1st Cir. 1972).

While Mr. Kolibash removed under the neighboring federal officer removal statute, Section 1442(a), the Fourth Circuit's adoption and application of the functional test in *Kolibash* applies equally in cases removed under Section 1441(a). *See, e.g.*, *Md. Comm'r of Fin. Reg. v. Western Sky Fin., LLC*, No. WDQ-11-0735, 2011 WL 4894075, at *2 (D. Md. Oct. 12, 2011) ("Judges in the District of Maryland have applied the functional framework in *Kolibash* to cases removed under § 1441."). For good reason: the statutes' relevant text is identical. Sections 1441(a) and 1442(a) share the definition of "State court" supplied by Section 1451, and "the phrase 'State courts' is to be given uniform meaning for all of the removal provisions," *Weso v. Menominee Indian Sch. Dist.*, 915 F. Supp. 73, 77 (E.D. Wis. 1995).[20] Indeed, *Kolibash* itself flagged the "similar provision[s]" of Sections 1441 and 1442 and "cit[ed] favorably"[21] to *Volkswagen de Puerto Rico, Inc.*—a seminal case in which the First Circuit applied the functional test to conclude that given the federal interests, a labor relations board qualified as a "State court" under Section 1441. *Kolibash*, 872 F.2d at 576.[22]

---

[20] The doctrine of *in pari materia* also compels construing "State court" identically in Sections 1441 and 1442. That doctrine directs that "adjacent statutory subsections that refer to the same subject matter should be read harmoniously." *New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225, 249 (4th Cir. 2012) (citations omitted). The legislative history compels the same. *See* H.R. No. 80-308 at 6 (1947), A343–45, A430. Congress created Sections 1441, 1442, and 1447 (another nearby removal provision) out of two predecessors as part of its 1947 simplification of removal statutes—and it continued to use "State court" in all three new statutes. *Cf. Kolibash*, 872 F.2d at 573 ("Sections 1447(c) and 1447(d) are *in pari materia* and are to be construed accordingly."). That common lineage underscores that "State court" means the same thing across those three removal statutes.

[21] *Wilson*, 821 F. Supp. at 783.

[22] Courts interpreting the term "State court" under other sections of the removal statute likewise have been guided by *Volkswagen*—thus reinforcing interpretational parity across the removal provisions. *See, e.g.*, *Nationwide Mutual Insurance v. New Hampshire Department of Labor*, No. 07-cv-241-PB, 2007 WL 2695387, at *7 (D.N.H. Sept. 12, 2007) (adopting Report & Recommendation) (applying *Volkswagen*'s functional test to the term "State court" in 28 U.S.C. § 1446(d)).

Removal is proper here for the same reasons it was proper in *Kolibash.* As in *Kolibash*, the predominant federal interests weigh heavily against remand. *See infra* Part II.B. Given that context, the OAH is sufficiently court-like for removal. *See infra* Part II.C.

B.       Because the Commissioner's Claims Are Completely Preempted, Federal Interests Are at Their Apex.

We are unaware of any case finding that federal interests predominate—whether in the preemption context, the federal-officer context, or any other context—yet remanding for lack of a sufficiently court-like state tribunal. To do so would "elevate form over substance"—precisely what *Kolibash* refused to do. And here, the federal interests overwhelm any state interests.

Federal interests peak in complete-preemption cases. Complete preemption is reserved for "rare" and "exception[al]" statutes, 16 MOORE'S FED'L PRAC. – Civ. § 107.75, that "*evince such a strong federal interest* that, when they apply to the facts underpinning the plaintiff's state-law claim, they convert that claim into one arising under federal law." *In re Blackwater Security*, 460 F.3d at 584 (emphasis added). *See also supra*, Part I.A. In complete preemption cases, Congress and the Supreme Court have left no doubt on the result of state-federal balancing: the federal interests so predominate that the case must be litigated in federal court, even if that requires announcing an exception to the well-pleaded complaint rule over a sharp dissent, *see Beneficial*, 539 U.S. at 18 (Scalia, J., dissenting). Thus, while the federal interests underpinning Section 27 are different than those implicated by the federal officer removal statute in *Kolibash* and *Wilson*, they are no less powerful.

By contrast, Maryland has no legitimate interest here. Because they are completely preempted, there is "no such thing" as the state-law claims it purports to bring. That is so even when the state statutes cover "areas" such as "consumer protection" that are "squarely within the ambit of the states' historic powers." *Greenwood*, 971 F.2d at 827–28. Instead, "due regard for

state sovereignty . . . does not serve as a buckler against the force of the Supremacy Clause." *Id.* at 828. Perhaps the Commissioner insists on proceeding in the OAH because he believes that tribunal is more likely to "err [by] allow[ing] the claim[s] to proceed under state law notwithstanding Congress's decision to make the federal case of action exclusive." *Beneficial*, 539 U.S. at 20 (Scalia, J., dissenting) (quoting Brief for the U.S. as Amicus Curiae, *Beneficial*, 2003 WL 1098993, at *18 (U.S. Mar. 7, 2003)). But that is just what complete preemption aims to prevent. And at any rate, an interest of that sort is hardly a legitimate one.

We are aware of only one case in which the plaintiff argued that even completely preempted claims could not be removed from a state agency: *Insurance Commissioner of Puerto Rico v. Doral Insurance Agency, Inc. See* No. 05-2230-CCC, 2006 WL 3196472, at *3–6 (D.P.R. Nov. 2, 2006). There the court recognized "important state interests" in enforcing insurance laws. *Id.* at *3. It also accepted "that a state restriction may be intended to serve consumer protection purposes." *Id.* at *4. Even so, the federal interest predominated—and an insurance commission was thus a "State court"—because the state claims were completely preempted. *Id.*

Even in cases of *ordinary* preemption, courts uniformly hold that the federal interests swallow any state interests and the functional test is met. For example, in *Volkswagen* and *Floeter*, the federal interests predominated and removal from state agencies was proper because the cases "involved questions of federal labor law, an area in which the federal interest is so strong that 'as a matter of substantive law, Congress has preempted the field.'" *Rockville Harley-Davidson v. Harley-Davidson Motor Co.*, 217 F. Supp. 2d 673, 679–80, 679 n.12 (D. Md. 2002) (distinguishing *Volkswagen*, 454 F.2d 38, and *Floeter*, 597 F.2d 1100) (cited in CFR Br. at 8–13).[23]

---

[23] *See also, e.g.*, *Nationwide Mutual*, 2007 WL 2695387, at *7 (holding on preliminary-injunction motion that NH DOL likely was a state court for removal purposes, given the "strong federal interest in completely assuming subject matter jurisdiction over ERISA issues"); *Martin v.*

Plaintiff makes two arguments on the federal-state balancing that miss the point of complete preemption. *First*, the Commissioner claims that federal interests are "slight" because the Charge Letter alleges only violations of state law. (*See* CFR Br. at 13.) Yet through complete preemption, the Commissioner's state-law claims have been "transform[ed] . . . into federal claims," *Lontz*, 413 F.3d at 441. "[F]ederal law . . . 'provides the exclusive cause of action for such claims,' and therefore '*there is . . . no such thing as a state-law claim*' in the regulated area." *Id.* at 440 (emphasis added). *Second*, the Commissioner claims that the Bank "would be free to raise in the State administrative process any of the federal usury defenses." (CFR Br. at 13.) The Commissioner gets the rule exactly backwards. Because the FDIA is one of the few federal laws that triggers *complete* preemption, "federal usury defenses" necessarily proceed in federal court. *See Beneficial*, 539 U.S. at 8 ("a state claim may be removed to federal court . . . when a federal statute wholly displaces the state-law cause of action through complete pre-emption").

C.    <u>When Federal Interests Predominate, Removal Is Proper Even From Tribunals Less Court-Like Than the OAH.</u>

The most intuitive approach to deciding whether a tribunal qualifies as a "State court" may well be examining the way the tribunal operates and nothing else—and some courts do it that way. The Fourth Circuit does not. It applies a "functional test" that focuses on balancing the federal and state interests in the case. That balance not only shapes the assessment of a tribunal's court-like attributes; it has invariably proven to be outcome determinative. *See infra* Part II.C.1. Under the functional test, when federal interests predominate, the tribunal need only perform basic "adjudicatory" functions to count as a court—a hurdle easily cleared here. *See infra* Part II.C.2.

---

*Schwerman Trucking Co.*, 446 F. Supp. 1130, 1131 (E.D. Wis. 1978) (holding that an agency was a "state court" under Section 1441(a) when state-law claims were preempted by federal labor law).

      1.     *The OAH's Court-Like Features Must Be Examined In Light of the Federal Interests.*

The weighty federal interests must shape this Court's assessment of the OAH's court-like attributes. The case law teaches that a particular tribunal is not always a "State court" or always not a "State court"—that would "elevate form over substance," *Kolibash*, 872 F.2d at 576. Instead, a given agency can be a "State court" when federal interests predominate, yet not a "State court" when they do not. *See Western Sky*, 2011 WL 4894075, at *3 n.7 (explaining that "a given state agency could be a 'State court'" or "not a 'State court'" depending on whether there are "overriding federal interests'"); *see also Wilson*, 821 F. Supp. 2d at 791 (same).

*Kolibash* itself highlights the importance of the federal-interest overlay: there the "court-like features of the [ethics committee] were [held] sufficient . . . *in light of the strong federal interests at stake*," *Wilson*, 821 F. Supp. 2d at 790. In *Wilson*, HCADRO was "less-court like" or "similar to . . . agencies that have been held not to be State courts"; the court distinguished those holdings—from cases on which the Commissioner relies—and held HCADRO to suffice based not on the tribunal's characteristics, but the federal-state balancing in each case. *Id.* at 788, 790.

Indeed, strong federal interests are not just informative, they have proven to be outcome determinative. In cases applying the functional test, when federal interests predominate, removal is held to be proper. That is so no matter whether the tribunal is more court-like than the OAH, less court-like than the OAH, or much like the OAH—as Appendix D shows.

Thus, when applying the functional test, context is everything. For just that reason, the authorities on which the Commissioner relies are unhelpful here: in all four cases, state interests predominated. *Gottlieb* is a diversity-jurisdiction case involving "[n]o issue of federal law" and a "strong" state interest in enforcing insurance laws that "dwarf[ed] any federal interest." 388 F. Supp. 2d at 580, 582. The "sole federal interest at stake" in *Harley-Davidson* was "providing a

forum to diverse parties." 217 F. Supp. 2d at 680. That gave way to " the strong state interest" in adjudicating disputes between state-regulated manufacturers. *Id*. at 679–80. There was *no* federal interest in providing a federal forum in *Ginn v. North Carolina Department of Corrections*, yet the reasons for proceeding in a state forum "militate[d] strongly" in favor of remand. 829 F. Supp. at 804 (E.D.N.C. 1993). In *Western Sky* too, the state's "interests in the subject of—and providing a forum for—[the] proceeding outweigh[ed] the federal interest," 2011 WL 4894075, at *4.[24]

> 2.   *OAH Hearings Are Sufficiently "Adjudicatory" to Permit Removal Here.*

When, as here, federal interests predominate, a tribunal need only act "in an adjudicatory manner" to count as a state court. *See Kolibash*, 872 F.2d at 576. Even based on the Commissioner's own description of its "quasi-judicial proceedings that investigate, declare, and enforce liabilities," (CFR Br. at 22), the OAH comfortably satisfies that test.

Defendants received a notice for an OAH hearing on a specific date stating that the failure to appear could result in a "decision against [them]." (Hr'g Notice at 17.) And that hearing would have been "adjudicatory" in the same six ways as the disciplinary proceeding in *Kolibash*:

1.   **Evidentiary Hearings.** The ethics committee was "authorized to hold evidentiary hearings"—and so is the OAH.[25]

2.   **Subpoenas.** Just as the ethics committee in *Kolibash* could "subpoena witnesses," the OAH "may issue subpoenas[.]"[26]

---

[24] Plaintiff also cites *Woodruff v. Hartford Life Group Insurance Co.*, 378 F. Supp. 2d 546, 551 (D. Md. 2011). But there the court did not decide the "State court" issue because the "case hinge[d] on . . . the timing of the Defendant's notice of removal." *Id.*

[25] *See Kolibash*, 872 F.2d at 576; (Charge Ltr. at 13 ("At the hearing, parties may call witnesses and submit documents or other evidence in the record.")); Md. Code, State Gov't § 9-1605(c).

[26] *See* 872 F.2d at 576; (Hr'g Notice at 15); Md. Code, State Gov't § 9-1605(c).

3.   **Testimony Under Oath.** The ethics committee's ability to "take testimony under oath" mattered in *Kolibash*.[27] Here too the Commissioner or his designee can "compel witness attendance" and "administer oaths and affirmations."[28]

4.   **Adversary Proceeding.** The Fourth Circuit emphasized the prospect of "an adversary proceeding"—precisely what occurs in the OAH.[29]

5.   **Findings and Conclusions.** The ethics committee and the OAH both issue findings of fact and conclusions of law.[30]

6.   **Court-Like Conduct.** The ethics committee "otherwise conduct[s] itself as a court"—as does an ALJ, who must "[m]aintain order" and "[c]onduct a full, fair, and impartial hearing."[31]

The OAH has yet more court-like attributes not present in *Kolibash*—i.e., (a) the requirement that any counsel be admitted in Maryland, (b) mandatory participation by parties, and (c) transcription of proceedings. *See* Md. Code Regs. 14.03.05.4(H)(11); (Hr'g Notice at 13); *cf. Nationwide Mutual*, 2007 WL 2695387, at *7. A contested OAH hearing is thus the functional equivalent of a trial.   Proceedings have been held sufficiently "adjudicatory" based on far less: given the overriding federal interests, even a "totally optional" arbitration before a tribunal "less court-like than the OAH" counted as a state court in *Wilson*. 821 F. Supp. 2d at 788, 790.

The Commissioner claims that the OAH is not court-like because it "must turn to the circuit courts to seek enforcement." (CFR Br. at 11.) But *Kolibash* forecloses that argument:  it held that a bar committee was a state court despite having only the ability to "*recommend[ ]* attorney

---

[27] 872 F.2d at 576.

[28] Md. Code Ann., Fin. Inst. § 2-114(b); *see also* Md. Code Regs. § 28.02.01.11(B); Md. Code, State Gov't § 9-1605(c).

[29] *See Kolibash*, 872 F.2d at 576; (CFR Br. at 22 (asserting that OAH proceedings are "adversarial, trial-like hearings")); Md. Code, State Gov't § 10-213.

[30] *See Kolibash*, 872 F.2d at 576; Md. Code Regs. § 09.01.03.08 (providing that the ALJ is to submit findings of fact and conclusions of law for approval by the Commission); Md. Code Ann., Fin. Inst. § 2-115(b) (authorizing Commissioner to determine whether "a person has engaged in an act or practice constituting a violation of law, regulation, rule or order").

[31] *Kolibash*, 872 F.2d at 576; Md. Code Regs. § 28.02.01.11(A)(1), (A)(3), (B)(13).

sanctions to" the state high court, 597 F.2d at 1102 (emphasis added).[32] And while the Commissioner relies on OAH ruling being "appealable to the circuit court," the prospect of an enforcement or appeal phase in Circuit Court weighs *against* remand. Because this case would be "removable at the enforcement stage," it makes no sense to delay removal until after "the expenditure of substantial resources in a futile proceeding." *Volkswagen*, 454 F.2d at 44–45.

### 3. The Commissioner Distorts the Analysis by Eliding the Role of the OAH.

The Commissioner urges the Court to assess the OCFR's court-like attributes and ignore those of the OAH. (CFR Br. at 11). That is the wrong approach for three reasons. *First*, it skews the facts. The Commissioner claims that "the OCFR did not bring its action in the OAH," (*id.*), yet the OCFR ordered that the matter would be heard before the OAH in its first pleading, the "Statement of Charges and Order for Hearing," (Charge Ltr. at 2, 13). The Commissioner may be trying to write the OAH out of the story because *Western Sky*, block-quoted three times in his brief, involved no OAH hearing. (*See* CFR Br. at 8–12.) That case is off-point not just because *state* interests predominated, *see* 2011 WL 4894075, at *4, but also because unlike here, the OCFR did not "delegate authority to the [OAH] to conduct *a full evidentiary hearing*" before removal. *See Md. Comm'r Fin. Reg. v. Western Sky Financial, LLC*, No. 1:11-cv-735-WDQ, CFR Br., Dkt. No. 9-1 at 4 (D. Md. Apr. 18, 2011) (Ex. 10) (emphasis added); *cf. Woodruff* (noting that "State court" issue would have involved assessment of OAH's court-like features had the timing of removal not been dispositive). Judge Quarles thus never considered the OAH's trial-like proceedings, *see supra* Part II.C.2, in *Western Sky*. The Commissioner engages in further revisionism when he claims to

---

[32] *Kolibash* echoes *Floeter*, where the Seventh Circuit held that an agency's "need to resort to the court system for enforcement of its orders does not change the essentially judicial character of the proceedings," 597 F.2d at 1102; *see also Volkswagen*, 454 F.2d at 44–45 (rejecting argument based on "lack of enforcement power"); *Wilson*, 821 F. Supp. 2d at 790 (holding tribunal to be a state court, even though its powers are "subject to the agreement of the parties to utilize its power").

have merely "delegated his fact-finding authority to OAH," (CFR Br. at 11). To the contrary, the ALJ presiding over the OAH hearing would have "decide[d] the case based on the facts and the law." (Hr'g Notice at 16.) And that means determining "whether the [Commissioner's] order issued to the Respondent[s], including any fines and/or restitution, is legally authorized and consistent with applicable statutes, regulations, policies, and procedures." (*Id.* at 1). *Second*, no matter what the Commissioner calls the state proceeding, it would have involved an OAH hearing. The features of that hearing are hardly irrelevant—as the Commissioner recognized when he advocated for *Younger* abstention based on the "adversarial, trial-like," and "quasi-judicial proceedings" in the OAH, (CFR Br. at 22).

*Third*, whether the state administrative process is labeled "OAH" or "OCFR" ultimately makes no difference.  Both are sufficiently adjudicatory given the predominant federal interests.

## III.   *YOUNGER* ABSTENTION DOES NOT APPLY TO REMOVED PROCEEDINGS.

*Younger* abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Com. of Va. ex rel. Kilgore v. Bulgartabac Holding Grp.*, 360 F. Supp. 2d 791, 797 (E.D. Va. 2005). Abstention is warranted only "when three conditions are satisfied: (1) there is an ongoing state judicial proceeding, (2) the proceeding implicates important state interests, and (3) there is an adequate opportunity to present the federal claims in the state proceeding." *Id.*

The case for abstention here fails at the first element: there is no ongoing state action. Upon removal, this "removed action [wa]s no[ longer] pending in the" OAH. *Kilgore*, 360 F. Supp. 2d at 797. Instead, "[i]t is extant only" here—"in the federal court to which it was removed." *Id.* "For that reason, the removed case cannot satisfy the threshold facet of *Younger* abstention." *Id.* Thus, in removal cases like this one, "the first requirement of *Younger* fails to be satisfied and *abstention*

*would be wholly inappropriate*." *N. Carolina ex rel. N. Carolina Dep't of Admin. v. Alcoa Power Generating, Inc.*, 989 F. Supp. 2d 479, 483 (E.D.N.C. 2013) (emphasis added).[33]

The Commissioner cites nothing to the contrary. He instead relies exclusively on rulings from cases that involved a separate, ongoing state proceeding. Cases like those do not apply here.

## IV.  THE IS NO REASON FOR THE COURT TO DECLINE SUPPLEMENTAL JURISDICTION OVER THE CLAIMS AGAINST ASC AND FORTIVA.

When even one claim is completely preempted, "removal [i]s proper as to the whole case." *Franchise Tax Bd.*, 463 U.S. at 13. In this case, keeping the claims together is not just "proper," but sensible too:  as the Commissioner acknowledges, the claims all "arise from the same general controversy"—precisely why he achieved "efficiency" by asserting the claims together. (CFR Br. at 18, 19.) Even so, Plaintiff asks the Court to exercise its discretion to decline supplemental jurisdiction.

A district court "may decline" to exercise supplemental jurisdiction only in four situations:

(1)   the claim raises a novel or complex issue of State law,

(2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)   the district court has dismissed all claims over which it has original jurisdiction, or

(4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

---

[33] Several circuit courts have reached the same conclusion. *Vill. of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 783 (7th Cir. 2008) ("Removal under 28 U.S.C. § 1441 simply does not leave behind a pending state proceeding that would permit *Younger* abstention."); *In re Burns & Wilcox, Ltd.*, 54 F.3d 475, 477 (8th Cir. 1995) (holding in removal context that there was "no ongoing state action in favor of which to abstain"). So have "[d]istrict courts across the country." *Zeeco, Inc. v. JPMorgan Chase Bank, N.A.*, No. 17-CV-384-JED-FHM, 2017 U.S. Dist. LEXIS 211158, at *8–9 (N.D. Okla. Dec. 21, 2017) (holding that *Younger* abstention is unavailable in removed proceedings and collecting similar cases).

28 U.S.C. § 1367(c). Contrary to the Commissioner's argument, neither the first nor the fourth situation is presented here. The claims against ASC and Fortiva do not involve "novel or complex issues of State law." Those claims could only be considered "novel" in the sense that the Commissioner has never before tried to subject bank service companies to its statutes governing credit services businesses and collection agencies. The claims against ASC and Fortiva raise no novel or nuanced *legal* issues, *see* 15A MOORE'S FED'L PRAC.–CIV. § 106.64 ("[A] matter is not rendered novel or complex merely because . . . there are no reported cases on the subject.").

Nor are there "exceptional circumstances" or "compelling reasons" that justify splitting this case into two. According to the Commissioner, "the most compelling reason" to decline supplemental jurisdiction is that the claims against ASC and Fortiva are "wholly severable" from the claims against the Bank. (CFR Br. at 18.) But just because the claims *can* be severed does not mean that they *should* be—much less that there are "compelling reasons" to do so. Nowhere does the Commissioner explain what would be gained by unwinding related claims that were investigated together and asserted together.

## CONCLUSION

For these reasons, Defendants request that the Court deny the Commissioner's Motion to Remand. For the same reasons, "there is" no "substantial ground for difference of opinion" on the complete-preemption or "State court" issues.  If, however, the Court concludes to the contrary, Defendants request that the Court (i) deny the motion to remand and (ii) certify an appeal under 28 USC § 1292(b). Doing so is appropriate because both issues are "controlling questions of law" the resolution of which will "materially advance the ultimate termination of litigation." *Id.* If the Court were instead to grant the motion, it would divest itself of jurisdiction and be unable to certify

an appeal. And under 28 U.S.C. §1447(d), "an order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise."

Thus, "when a difficult removal question is presented," a district court may—without "subvert[ing] § 1447(d)"—"deny remand and certify an appeal if the district court would welcome appellate resolution." WRIGHT & MILLER 16 FED. PRAC. & PROC. JURIS. § 3931 (3d ed.). And district courts have done just that. *See, e.g.*, *In re Microsoft Corp. Antitrust Litig.*, No. MDL-1332, 2001 WL 137255, at *1 (D. Md. Feb. 15, 2001) (denying remand and certifying); *White v. United Steelworkers of Am., AFL-CIO*, 7 Fed. R. Serv. 2d 363 (W.D.N.C. 1963) (denying remand and certifying *sua sponte* because the court was "caught on the horns of a dilemma" over a remand issue). Indeed, *Hawaii* came to the Ninth Circuit on a Section 1292(b) certification that was prompted by the complete-preemption issue there. *Hawaii ex rel. Louie v. JP Morgan Chase & Co.*, 921 F. Supp. 2d 1059, 1066 (D. Haw. 2013).

Dated:    October 15, 2021

Respectfully submitted,

*/s/ Douglas Gansler*

Douglas Gansler (Fed. Bar No. 21010)
Rachel Rodman (*pro hac vice*)
**CADWALADER, WICKERSHAM & TAFT LLP**
700 Sixth Street, N.W.
Washington, DC 20001
(202) 862-2300
Fax (202) 862-2400
douglas.gansler@cwt.com
rachel.rodman@cwt.com

Jonathan M. Watkins (*pro hac vice*)
**CADWALADER, WICKERSHAM & TAFT LLP**
200 Liberty Street
New York, NY 10281
(212) 504-6000
Fax (704) 348-5200
jonathan.watkins@cwt.com

Ava E. Lias-Booker (Fed. Bar No. 05022)
Melissa O. Martinez (Fed Bar No. 28975)
**MCGUIREWOODS LLP**
500 E. Pratt Street, Suite 1000
Baltimore, Maryland 21202-3169
(410) 659-4400
Fax (410) 659-4558
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

***Counsel for Defendants***

# APPENDIX A

## Repealed Section 12-314 of the Maryland Code, Commercial Law[1]

§ 12-314                     ANNOTATED CODE OF MARYLAND

**University of Baltimore Law Review. —** For article, "Bank Credit Card Interest Rates in Maryland: How High Can They Go," see 11 U. Balt. L. Rev. 517 (1982).

**Unpermitted fees unlawful. —** Contracting for, charging or receiving unpermitted additional fee is unlawful in itself under (a)(1). It is not simply a question of whether an unpermitted additional fee, when added to the contractually stated interest, will produce total consideration which, in relation to the length of time the principal, or any part thereof, has been outstanding, exceeds the statutory rate limit. Attorney Gen. v. Equitable Trust Co., 294 Md. 385, 450 A.2d 1273 (1982).

**Intentional and knowing charging of points deemed willful. —** Where lender did not accidentally charge points on a loan, but intentionally, knowingly, and voluntarily charged points, the lender acted willfully, as that term is used in (b), when it violated § 12-306(d) of this article; the fact that the lender did not realize that the loan was governed by this subtitle was not relevant. Pacific Mtg. & Inv. Group, Ltd. v. Horn, 100 Md. App. 311, 641 A.2d 913 (1994).

**Rate of interest chargeable by national banks. —** For the relationship between the most favored lender doctrine of the National Bank Act, 12 U.S.C. § 85, and this subtitle with respect to the rate of interest that may be charged by national banks, see Attorney Gen. v. Equitable Trust Co., 294 Md. 385, 450 A.2d 1273 (1982).

## § 12-314. Loans at greater than authorized rate of interest.

(a) *Prohibited.* — A person may not lend $6,000 or less if the person directly or indirectly contracts for, charges, or receives a greater rate of interest, charge, discount, or other consideration than that authorized by the laws of this State.

(b) *Loans unenforceable; exceptions.* — (1) A loan made in the amount of $6,000 or less, whether or not the loan is or purports to be made under this subtitle, is unenforceable if a rate of interest, charge, discount, or other consideration greater than that authorized by the laws of this State is contracted for by any person unless the excess rate contracted for is the result of a clerical error or mistake and the person corrects the error or mistake before any payment is received under the loan.

(2) The person who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection.

(3) This subsection does not apply to a person who is a licensee or who is exempt from licensing under this subtitle.

(c) *Transactions made in another state.* — This section does not apply to a loan transaction validly made in another state in compliance with a similar loan law of that state. However, a lender may not collect an amount that is more than the total amount that would be permitted if this subtitle were applicable. This section applies to all loans made by a lender domiciled in another state to a borrower who is a resident of this State if the application for the loan originated in this State. (1977, ch. 693, § 3; 1980, ch. 33, § 5; 1989, ch. 725.)

---

[1] *Michie's Annotated Code of the Public General Laws of Maryland*, CL § 12-314 (2013).

## APPENDIX B

### Section 27 of the Federal Deposit Insurance Act

Codified at 12 U.S.C.A. § 1831d(a) and § 1831d(b)

**§ 1831d. State-chartered insured depository institutions and insured branches of foreign banks**

**(a) Interest rates**

In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

**(b) Interest overcharge; forfeiture; interest payment recovery**

If the rate prescribed in subsection (a) exceeds the rate such State bank or such insured branch of a foreign bank would be permitted to charge in the absence of this section, and such State fixed rate is thereby preempted by the rate described in subsection (a), the taking, receiving, reserving, or charging a greater rate of interest than is allowed by subsection (a), when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover in a civil action commenced in a court of appropriate jurisdiction not later than two years after the date of such payment, an amount equal to twice the amount of the interest paid from such State bank or such insured branch of a foreign bank taking, receiving, reserving, or charging such interest.

# APPENDIX C

## Sections 85 and 86 of the National Bank Act

Codified at 12 U.S.C.A. § 85 and § 86

### § 85. Rate of interest on loans, discounts and purchases

Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under title 62 of the Revised Statutes. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run. The maximum amount of interest or discount to be charged at a branch of an association located outside of the States of the United States and the District of Columbia shall be at the rate allowed by the laws of the country, territory, dependency, province, dominion, insular possession, or other political subdivision where the branch is located. And the purchase, discount, or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, discount, or sale, at not more than the current rate of exchange for sight drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest.

### § 86. Usurious interest; penalty for taking; limitations

The taking, receiving, reserving, or charging a rate of interest greater than is allowed by section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same: *Provided,* That such action is commenced within two years from the time the usurious transaction occurred.

**APPENDIX D**

**Overview of Case Law Applying Functional Test**

| Case | Is the state tribunal more or less court-like than the OAH? | What interests predominate? | Result |
|---|---|---|---|
| *Kolibash v. Committee on Legal Ethics of W. Va. Bar*, 872 F.2d 571, 576 (4th Cir. 1989) | Less court-like | Federal | Removal proper |
| *Wilson v. Gottlieb*, 821 F. Supp. 2d 778, 788–91 (D. Md. 2011) | Less court-like | Federal | Removal proper |
| *Volkswagen de Puerto Rico, Inc. v. Puerto Rico Lab. Relations Bd.*, 454 F.2d 38, 41, 44, 45 (1st Cir. 1972) | Same or similar | Federal | Removal proper |
| *Floeter v. C.W. Transport, Inc.*, 597 F.2d 1100, 1102 (7th Cir. 1979) | Same or similar | Federal | Removal proper |
| *Ins. Comm'r of Puerto Rico v. Doral Ins. Agency, Inc.*, No. 05-2230-CCC, 2006 WL 3196472, at *2–4, 6 (D.P.R. Nov. 2, 2006) | Same or similar | Federal | Removal proper |
| *Martin v. Schwerman Trucking Co.*, 446 F. Supp. 1130, 1131 (E.D. Wis. 1978) | Same or similar | Federal | Removal proper |
| *Tool & Die Makers Lodge v. Gen'l Elec. Co.*, 170 F. Supp. 945, 950–51 (E.D. Wis. 1959) | Same or similar | Federal | Removal proper |
| *Nationwide Mut. Ins. v. N.H. Dep't of Labor*, No. 07-cv-241-PB, 2007 WL 2695387, at *7–8 (D.N.H. Sept. 12, 2007) | Same or similar | Federal | Removal proper |
| *Lucchino v. Foreign Countries of Brazil, S. Korea, Spain, Mexico and Argentina*, 631 F. Supp. 821, 824–25 (E.D. Pa. 1986) | More court-like | Federal | Removal proper |
| *Ginn v. N.C. Dep't of Corr.*, 829 F. Supp. 804, 806 (E.D.N.C. 1993) | More court-like | State | Remand |
| *Gottlieb v. Lincoln Nat'l Life Ins. Co.*, 388 F. Supp. 2d 574, 580–81 (D. Md. 2005) | Same or similar | State | Remand |
| *Rockville Harley-Davidson v. Harley-Davidson Motor Co.*, 217 F. Supp. 2d 673, 677, 680 (D. Md. 2002) | Same or similar | State | Remand |
| *Md. Comm'r of Fin. Reg. v. Western Sky Fin., LLC*, No. WDQ-11-0735, 2011 WL 4894075, at *3–5 (D. Md. Oct. 12, 2011) | Same or similar | State | Remand |
| *Wirtz v. United Distillers & Vintners, N. Am., Inc.*, 224 F.3d 708, 711, 713–14 (7th Cir. 2000) | Less court-like | State | Remand |

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2021 a copy of **Defendants' Opposition to Plaintiff's Motion to Remand** was electronically filed through the Court's CM/ECF System, which will send a notification of such filing to:

>
> Kevin W. McGivern
> Assistant Attorney General
> Department of Labor
> 500 North Calvert Street, Suite 406
> Baltimore, Maryland 20202
> kevin.mcgivern@maryland.gov
>
> *Counsel for Plaintiff Antonio P. Salazar, in his official capacity as Commissioner of The Office of the Commissioner of Financial Regulation*

Respectfully submitted,

*/s/ Douglas Gansler*

Douglas Gansler (Fed. Bar No. 21010)
**CADWALADER, WICKERSHAM & TAFT LLP**
700 Sixth Street, N.W.
Washington, DC 20001
(202) 862-230
douglas.gansler@cwt.com